**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| W&T OFFSHORE, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Case No. _____ |
| UNITED STATES DEPARTMENT OF THE | § | |
| INTERIOR, | § | |
| | § | |
| *Defendant.* | § | |

**COMPLAINT**

Plaintiff W&T Offshore, Inc. ("W&T") files this Original Complaint against Defendant United States Department of the Interior ("DOI" or the "Department). W&T would respectfully show the following and seek the relief set forth below:

1.      W&T seeks judicial review of a final decision (the "Decision") by the Department dismissing W&T's appeal of an Incidence of Noncompliance issued to W&T by the Department's Bureau of Safety and Environmental Enforcement ("BSEE"). *W&T Offshore, Inc.*, IBLA 2025-0313 (January 29, 2026), attached hereto as Exhibit 1.

**JURISDICTION AND VENUE**

2.      This action arises under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331, *et seq.*; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, *et seq.*

3.      The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question); 43 U.S.C. § 1349(b)(1) (OCSLA); and 5 U.S.C. § 704 (judicial review of final agency action).

4.      The Decision constitutes a final agency action appropriate for judicial review under 5 U.S.C. § 704. *See* 43 C.F.R. § 4.21(b)(3) ("The final decision of the Director or an Appeals

Board constitutes the final agency action of the Department and is effective on the date it is issued unless the decision provides otherwise.").

5. Venue is proper as the Department may be found in this district. 43 U.S.C. § 1349(b)(1); 28 U.S.C. § 1391(e).

## PARTIES

6. W&T is a corporation organized under the laws of the State of Texas and has its principal office located in Houston, Texas.

7. The Department is a federal executive department and agency of the United States government.

## FACTUAL ALLEGATIONS

### A. Regulatory Framework

8. Relevant to this case, there are two types of interest in offshore oil and gas. Record title interest represents ownership of the federal lease itself—the right to transfer or relinquish, and the obligation to pay rent/royalties. *See* 43 C.F.R. § 3100.5. Record title interest holders are referred to as lessees or title owners.

9. Operating rights interest, or working interest, allows the holder to explore, drill, and produce. *Id.* Operating rights interest holders are referred to as operating rights owners.

10. Record title and operating rights interests are severable interests. Lessees may sublease operating rights, severing the operating rights from the record title interest. Lessees remain liable for regulatory compliance, even if they sublease operating rights.

11. Two Department bureaus operate in the offshore energy space: the Bureau of Ocean Energy Management ("BOEM") and BSEE.[1]

---

[1] On October 1, 2011, the Minerals Management Service ("MMS") was officially split into BOEM and BSEE.

12.     BOEM manages offshore resource leasing, planning, and environmental studies. BOEM is the agency responsible for issuing oil and gas leases, approving rights assignments, and approving exploration and development plans, such as plans for new pipelines, wells, and platforms. BOEM is additionally responsible for maintaining the serial register page for offshore leases, which documents a lease's status, records assignments, and identifies title owners and operating rights owners.

13.     BSEE, as the name implies, is primarily responsible for enforcing safety and environmental regulations pertaining to offshore field operations. BSEE's responsibilities include overseeing decommissioning of offshore infrastructure and enforcing 30 C.F.R. Part 250, Subpart Q, the federal regulations issued under OCSLA that govern offshore decommissioning activities.

14.     Under the regulations, lessees and operating rights owners, as well as their predecessors, are jointly and severally liable for their *accrued* decommissioning obligations. 30 C.F.R. § 250.1701(a); *see also id.* § 250.1700(d) (defining "predecessor" to mean "a prior lessee or owner of operating rights, or a prior holder of a right-of-use and easement grant or a pipeline right-of-way grant, that is liable for accrued obligations on that lease or grant").

15.     Per section 250.1702 of the regulations, decommissioning obligations are accrued in a finite number of ways.

*You accrue decommissioning obligations when you do any of the following:*

*(a) Drill a well;*

*(b) Install a platform, pipeline, or other facility;*

*(c) Create an obstruction to other users of the OCS;*

*(d) Are or become a lessee or the owner of operating rights of a lease on which there is a well that has not been permanently plugged according to this subpart, a platform, a lease term pipeline, or other facility, or an obstruction;*

*(e) Are or become a holder of a pipeline right-of-way grant on which there is a pipeline, platform, other facility, or an obstruction;*

*(f) Are or become the holder of a right-of-use and easement grant on which there is a well, pipeline, platform, other facility, or an obstruction; or*

*(g) Re-enter a well that was previously plugged according to this subpart.*

16.    "You" means "a lessee, the owner or holder of operating rights, a designated operator or agent of the lessee(s), a pipeline right-of-way holder, or a State lessee granted a right-of-use and easement." *Id.* § 250.105.

17.    A predecessor lessee or predecessor operating rights owner does not accrue decommissioning obligations for infrastructure installed after it has divested its interest in that lease. While predecessors hold joint and several liability for decommissioning obligations, this liability is limited to obligations that accrued *during* their period of ownership.

18.    Offshore infrastructure with no solvent responsible party remaining is considered "orphaned" infrastructure. BSEE manages orphaned infrastructure and the federal government allocates funds to help BSEE decommission orphaned infrastructure.

19.    As part of its responsibility to oversee decommissioning, BSEE is empowered to issue decommissioning orders when leases, ROWs or RUEs expire. BSEE is authorized to issue decommissioning orders requiring recipients to comply within specified timeframes and to perform required decommissioning in the time and manner specified. 30 C.F.R. § 250.1708. Failure to maintain and monitor facilities or to submit a decommissioning plan as required under § 250.1708(a) may result in an Incident of Noncompliance and potentially other enforcement actions, including civil penalties.

20.    Any party adversely affected by a BSEE official's final decision or order may appeal to the Department's Interior Board of Land Appeals ("IBLA"). *See id.* § 290.2; 43 C.F.R. Part 4, Subpart E. Governing federal regulations grant IBLA broad authority to review decisions

4

on appeal "as fully and finally as might the Secretary," with authority to affirm, modify, vacate, set aside, or reverse any decision. 43 C.F.R. § 4.413.

**B. BOEM Error Creates Cloud in WD 29 Title**

21.    At issue in this case is West Delta Block 29, OSC00385 ("WD 29"), located in the Gulf of America.

22.    W&T has never held record title interest in WD 29. W&T did hold operating rights interest in WD 29 from 1997 until January 1, 2013, when W&T divested its last interest in the lease to EPL Oil & Gas, LLC ("EPL").[2]

23.    From January 1, 2011, until the lease was relinquished on March 15, 2024, EPL held 100% record title interest in WD 29.

24.    In December 2011, Susan Hooper, of BOEM's Adjudication Section, emailed EPL's Becky Brennan in response to a question about designating an operator on various WD 29 tracts.[3] In her email, Ms. Hooper acknowledged that another BOEM employee—Debbie Armond—had recently "made three (3) tracts 'current' that were 'historical' before" and consequently BOEM's "records are messed up on this block." The December 2011 email is attached hereto as Exhibit 2.

25.    The three tracts affected by BOEM's error were SE1/4SW1/4SW1/4, SE1/4NE1/4SW1/4, and SW1/4NW1/4SE1/4 (the "Clouded Tracts").

26.    In her December 2011 email, Ms. Hooper went on to ask Ms. Brennan to "hold off a couple of days" before submitting a designation of operator form "to see if Debbie can straighten

---

[2] Energy Partners, Ltd. changed its name to EPL Oil & Gas, Inc. effective on September 1, 2012.
[3] Lease areas are often subdivided into sections, known as tracts or aliquots, which typically use cardinal directions to specifically describe the subdivision's location.

out the records." However, nearly *two years* later, BOEM had still not resolved the issue BOEM's own error and delay created.

27.    On May 2, 2013, W&T reached out to BOEM's Susan Hooper via email regarding the WD 29 lease records. Over a month later, Ms. Hooper finally responded, again acknowledging the lease errors created by BOEM and explaining BOEM had not yet fixed the errors: "There is a problem on this lease. A review of the assignments caused some historical tracts to be made active. We don't have access to the original file, it was lost. I don't think the records are correct; however, I haven't had time to get back to it."

28.    Ms. Hooper's email to W&T never suggested that BOEM's correction of its own errors regarding the WD 29 lease was in any way time sensitive. Ms. Hooper's communications also indicated that BOEM would handle the corrections and that no action was needed from W&T or EPL.

C.  **W&T Assigns All of its Operating Rights in WD 29 to EPL**

29.    On October 29, 2013, EPL filed with BOEM eleven assignments of operating rights (the "Assignments") and all necessary paperwork—including all required filing fees, which BOEM promptly processed as reflected in the Pay.gov receipts—as required by 30 C.F.R. § 556.701. The Assignments covered eleven WD 29 tracts and conveyed all of W&T's operating rights interests in WD 29 to EPL. All eleven Assignments had effective dates of January 1, 2013.

30.    Only three of the eleven Assignments involved the three Clouded Tracts. The remaining eight Assignments covered unencumbered tracts.

D.  **EPL Installs New Infrastructure on WD 29 with BOEM Approval**

31.    With the Assignments submitted to BOEM, as sole lease interest holder, EPL submitted plans to BOEM to install on WD 29 a new platform (Platform J), four new wells (Wells

6

J001, J002, J003, and J004), and three new pipeline segments (19038, 19039, and 19040) (all together, the "EPL Infrastructure"). EPL's plans listed WD 29's NW1/4NW1/4SW1/4 tract as the proposed location for Platform J and its associated wells. On each of the plans submitted to BOEM, EPL listed itself as the operator, signed as "Lessee or Operator," and made no reference to W&T.

32.    On December 26, 2013, BOEM approved EPL's plans for installation of Pipeline Segment Numbers ("PSN") 19038, 19039, and 19040 and on February 27, 2014, EPL completed installation of the three pipelines.

33.    On January 27, 2014, BOEM approved EPL's plans for Platform J and Wells J002 and J003. On March 6, 2014, EPL completed installation of Platform J. EPL spudded Well J002 on April 13, 2014, and Well J003 on July 26, 2014. All of the EPL Infrastructure was approved by BOEM and installed by EPL long after the January 1, 2013, effective date of W&T's WD 29 operating rights assignments to EPL.

34.    Platform J and Wells J001, J002, J003, and J004 are located in the NW1/4NW1/4SW1/4 tract of WD 29. The rights title interest and operating rights interest for the NW1/4NW1/4SW1/4 tract have never been severed. EPL has held 100% rights title interest and operating rights interest in the NW1/4NW1/4SW1/4 tract since January 1, 2011, when EPL acquired 100% of the record title interest in WD 29. W&T has never held any interest in the NW1/4NW1/4SW1/4 tract and consequently none of the eleven Assignments cover this tract.

35.    The pipelines were installed to support production on Platform J and its associated wells in the NW1/4NW1/4SW1/4 tract. Additionally, no part of the pipelines EPL installed is located in any of the three Clouded Tracts. All three pipelines cover three tracts: SE1/4SW1/4NW1/4, NW1/4NE1/4SW1/4, and NE1/4NW1/4SW1/4. Pipeline 19038 additionally covers the SW1/4SW1/4NW1/4 tract.

**E.**    **After BOEM Approved EPL's Installation of New WD 29 Infrastructure, BOEM Asks EPL and W&T to Execute Stipulations of Interest for the Clouded Tracts BOEM**

36.    On September 11, 2014, Ms. Brennan at EPL again reached out to BOEM for an update on WD 29. BOEM Deputy Regional Supervisor Ann Glazner responded to Ms. Brennan's inquiry, assuring EPL that BOEM was handling the problem on its end:

> *I apologize that the problems with the operating rights for OCS 0385 are affecting your permit and production. Debbie Armond is working to correct the operating rights so the pending assignments and any related DOOs can be processed; hopefully leading to resolution for your permitting and production issues. I will ask Debbie for an update on the corrections and will provide same to you as soon as I receive the status.*

The email chain containing the September 11, 2014, email is attached hereto as Exhibit 3.

37.    It was only after this prompting by EPL that BOEM personnel indicated that the parties to the Assignments would need to take action to correct BOEM's error from three years prior. In a September 22, 2014, email to an EPL colleague and a W&T employee, *see* Exhibit 3, Ms. Brennan explained:

> *The BOEM had lost some DOO'S relative to WD 29. They still had some aliquots in the name of Chevron Inc. Jim Laree with Chevron has provided copies of said DOO's to the BOEM. Debbie Armond with BOEM has said now that she has those DOO's we will need to prepare a Stipulation of Interest between W&T & EPL to put all of WD 29 into EPL. Debbie was to call Jamie Vasquez with W&T to have them prepare the Stipulation. I do not know the outcome of that. Let me know if you have any questions.*

38.    On September 9, 2016, EPL filed three Stipulations of Interest with BOEM (the "Stipulations"). The Stipulations cover only the Clouded Tracts and correct BOEM's error to clear title to the tracts. Each of the Stipulations has an effective date of January 1, 2013.

39.    On March 21 and 24, 2017, *four years* after the transfer, BOEM approved the Assignments for the eight unencumbered tracts, which include all of the tracts where the EPL Infrastructure is located. No stipulations of interest were filed with respect to these eight tracts as

8

it was unnecessary. On the serial register page for WD 29, BOEM listed January 1, 2013, as the effective date for the eight Assignments.

40.     On May 8, 2017—a month and a half later—BOEM approved the assignments for the three previously Clouded Tracts that were the subject of the Stipulations. On the serial register page for WD 29, BOEM again listed January 1, 2013, as the effective date for the three Assignments.

**F.  BSEE Orders WD 29 Decommissioning**

41.     For seven years, EPL worked the WD 29 lease as sole lessee and operating rights owner. On March 15, 2024, BOEM accepted EPL's relinquishment of the WD 29 lease, triggering the start of the decommissioning process. *See* 30 C.F.R. § 250.1710; *id.* § 250.1725(a). As of that date, EPL retained 100% record title interest and operating rights interest in the lease. In June 2024, EPL notified BSEE by letter that EPL would not be performing any of its required decommissioning work on WD 29.[4]

42.     On July 8, 2024, BSEE sent EPL's WD 29 predecessors-in-interest—W&T, Chevron Inc., and Anglo-Suisse Offshore Partners, LLC—a Decommissioning Order for Lease OCS 00385 (the "Decommissioning Order") notifying them of EPL's default of its decommissioning obligations for WD 29 and ordering the recipients to complete their respective accrued decommissioning obligations. The Decommissioning Order is attached hereto as Exhibit 4.

43.     The Decommissioning Order's enclosure identified the predecessors' accrued decommissioning obligations. The Decommissioning Order incorrectly included Platform J and PSNs 19038, 19039, and 19040 in W&T's accrued liabilities. The Decommissioning Order

---

[4] On May 14, 2023, EPL filed a voluntary petition for Chapter 11 bankruptcy. The case was subsequently converted to a Chapter 7 bankruptcy.

similarly included Platform J and PSNs 19038, 19039, and 19040 among Chevron's accrued liabilities.

44.    On October 3, 2024, BSEE issued an amended decommissioning order (the "Amended Order"). The Amended Order purported to add Wells J002 and J003 to W&T's accrued liabilities. Under the Amended Order, BSEE incorrectly attributed accrued liability for all of the EPL Infrastructure to W&T. The Amended Order also removed Platform J and PSNs 19038, 19039, and 19040 from Chevron's accrued liabilities. The Amended Order incorrectly states that Platform J and Wells J002 and J003 are located in the *NE1*/4NW1/4SW1/4 tract of WD 29, one of the unencumbered tracts. Platform J and Wells J002 and J003 are actually located in the *NW1*/4NW1/4SW1/4 tract, a tract that is not covered by any of the Assignments and in which W&T has never held any interest. The Amended Order is attached hereto as Exhibit 5.

45.    On June 25, 2025, BSEE issued to W&T an Incidence of Noncompliance ("INC A805"). BSEE's issuance of INC A805 was premised on W&T's purported failure to (1) perform monitoring and maintenance on Platform J and (2) comply with the Decommissioning Order and Amended Order. INC A805 is attached hereto as Exhibit 6.

46.    On August 4, 2025, W&T timely filed a notice of appeal and petition to stay INC A805 to IBLA (the "INC Appeal").

47.    On December 12, 2025, BSEE moved to dismiss the INC Appeal on the grounds that the orders underlying INC A805—the Decommissioning Order and the Amended Order—are administratively final. In support, BSEE attached as an exhibit to its motion a declaration of Bernadette Thomas, former Chief of Adjudication for BOEM, dated December 12, 2025.

48.    On December 15, 2025, during the pendency of W&T's INC Appeal, BSEE issued a new order to W&T and EPL's other WD 29 predecessors regarding decommissioning of another

pipeline on WD 29, PSN 11638. W&T timely appealed the PSN 11638 decommissioning order, docketed at IBLA 2026-0088. That appeal remains pending as BSEE has not yet filed the administrative record.

49.     On January 16, 2026, W&T filed a response to BSEE's motion to dismiss the INC Appeal. But on January 29, 2026, IBLA dismissed the INC Appeal, agreeing with BSEE that the Decommissioning Order and Amended Order were administratively final and thus IBLA lacked jurisdiction to consider the INC Appeal.

50.     On April 6, 2026, over two months after IBLA dismissed W&T's INC Appeal, BSEE issued yet another amendment to the Decommissioning Order with respect to WD 29. This second amendment once again alters the allocation of accrued decommissioning obligations amongst EPL's predecessors-in-interest, though BSEE still incorrectly lists the EPL Infrastructure among W&T's accrued liabilities.

## COUNT ONE
### IBLA's Determination of Its Scope of Review Is Incorrect

51.     W&T repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

52.     The APA provides that agency action which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" must be held unlawful and set aside. 5 U.S.C. § 706(2)(A). Under this standard, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation

11

for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

53.  IBLA's doctrine of administrative finality is not jurisdictional. It is a prudential, non-statutory rule of administrative law. *See Betty J. (Thompson) Bonin*, IBLA 96-130, at 11 (Oct. 20, 1999). Because the doctrine is not jurisdictional, it does not divest IBLA of authority to consider an appeal.

54.  The plain language of 43 C.F.R. § 4.413 grants IBLA extraordinarily broad review authority that contradicts any narrow jurisdictional limitation. The regulation unambiguously grants IBLA comprehensive jurisdiction, stating: "The Board has authority to review decisions on appeal as fully and finally as might the Secretary" and empowers IBLA to "raise or consider any matter that it deems material, whether or not raised by the parties." 43 C.F.R. § 4.413. This expansive language directly contradicts IBLA's claimed jurisdictional limitation.

55.  IBLA's restrictive interpretation violates the principle that agencies cannot "under the guise of interpreting a regulation . . . create *de facto* a new regulation." *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000). By claiming it lacks jurisdiction to review the Decommissioning Order and Amended Order, IBLA effectively creates a new jurisdictional limitation nowhere found in the regulatory text or any statute.

56.  The regulation's plain language grants IBLA authority equivalent to the Secretary's own plenary power and explicitly authorizes IBLA to consider any material matter, which would necessarily include the validity of the underlying orders being enforced. Courts have consistently recognized that IBLA "has de novo review authority over the decisions of subordinate decision-makers" and acts "as fully and finally as might the Secretary." *Noble Energy, Inc. v. Salazar*, 691

12

F. Supp. 2d 14, 24 (D.D.C. 2010) (quotations omitted). IBLA's interpretation impermissibly narrows this broad grant of authority without regulatory basis.

57.    For these reasons, the Decision is arbitrary, capricious, and otherwise contrary to law. It should be vacated.

**COUNT TWO**
**IBLA's Determination That the Decommissioning Order and Amended Order Are Administratively Final Is Incorrect**

58.    W&T repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

59.    IBLA's Decision dismissing W&T's INC Appeal is premised entirely on IBLA's agreement with BSEE that the Decommissioning Order and Amended Order are administratively final. This conclusion is incorrect.

60.    Courts review IBLA's application of the administrative finality doctrine under the APA's arbitrary-and-capricious standard. *See UOP v. U.S.*, 99 F.3d 344, 347 (9th Cir. 1996).

61.    IBLA's doctrine of administrative finality is "the administrative counterpart of the principle of res judicata." *Amoco Production Co.*, 143 IBLA 45 (1998). The doctrine is designed "to achieve orderliness in the administration of the public lands as well as *finality of decisions which have been closed finally* and have not been appealed or otherwise attacked." *P&K Coal Co., Ltd.*, 98 IBLA 26 (1987) (emphasis added).

62.    BSEE's own actions belie the assertion that the Decommissioning Order and Amended Order are in any way final. As the record demonstrates, BSEE has never settled on a final decommissioning determination for WD 29. BSEE first issued decommissioning orders for alleged obligations in connection with WD 29 in July 2024. Three months later, in October 2024, BSEE amended and added new alleged obligations with the Amended Order. Over a year later, in

13

December 2025 while W&T's INC Appeal was still pending before IBLA, BSEE issued yet another new decommissioning order covering additional infrastructure associated with WD 29. And three months after IBLA concluded that the Decommissioning Order and Amended Order were administratively final, BSEE issued yet another new order, which explicitly amended the Decommissioning Order and Amended Order. Each new order has altered the operative scope of W&T's WD 29 accrued decommissioning liability.

63.     For these reasons, the Decision is arbitrary, capricious, and otherwise contrary to law. It should be vacated.

## COUNT THREE
**IBLA's Refusal to Consider the Validity of BSEE's Orders Underlying the INC Is Arbitrary and Capricious**

64.     W&T repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

65.     Even assuming the Decommissioning Order and the Amended Order are administratively final (they are not), administrative finality is an equitable principle governing the scope of review, not IBLA's power to adjudicate. IBLA, "exercising the Secretary's review authority, is not required to accept as precedent erroneous decisions made by the Secretary's subordinates." *Kirby Expl. Co. of Texas*, 143 IBLA 133 (1998).

66.     IBLA precedent establishes that administrative finality may be overcome upon "a showing of compelling legal or equitable reasons, such as violations of basic rights of the parties or the need to prevent an injustice." *Id.* The fundamental unfairness of holding the wrong party liable for costly decommissioning due to agency error creates precisely the type of compelling legal and equitable circumstances that justify application of the manifest injustice exception to administrative finality.

14

67.     For these reasons, the Decision is arbitrary, capricious, and otherwise contrary to law. It should be vacated.

## COUNT FOUR
### The Department's Interpretation of Its Regulations Is Contrary to Its Plain Language

68.     W&T repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

69.     A predecessor operating rights holder does not accrue decommissioning obligations for infrastructure it neither installed nor owned as existing infrastructure.

70.     W&T's status as a predecessor-in-interest on WD 29 depends on accrued obligations, not merely its status as a prior operating rights owner. Federal regulations define a predecessor as "a prior . . . owner of operating rights. . . that is liable for accrued obligations on that lease." 30 C.F.R. § 250.1700. Under that definition, a party is not a predecessor for every later-installed infrastructure simply because it once owned operating rights. It is a predecessor only for obligations it *actually accrued*.

71.     Section 250.1702 creates two distinct accrual paths: (1) the party that drills a well or installs infrastructure accrues liability by the act of drilling or installing or (2) a later owner accrues liability only if it becomes a lessee or operating rights owner on which the well or other infrastructure already exists. Here, W&T fits neither path for the EPL Infrastructure. There was no event under section 250.1702 by which W&T accrued obligations for the EPL Infrastructure.

72.     Despite the fact that W&T could not have accrued decommissioning obligations because it divested operating rights in WD 29 before the EPL Infrastructure was installed, BSEE relies on 30 C.F.R. §§ 556.805–806 as the basis for W&T's obligation. These regulations provide that "[a]n operating rights owner (who does not hold record title) who assigns the operating rights remains liable for all obligations of the lease that accrued during the period in which the assignor

15

owned the operating rights, up to the effective date of the assignment, including decommissioning obligations that accrued during that period." 30 C.F.R. § 556.805. The effective date of an assignment of operating rights is the first day of the month following the date on which BOEM approves the request to assign the rights. *See id.* § 556.806

73.    BSEE's reliance on sections 556.805 and 556.806 is incorrect. BSEE's reading of the regulations presupposes that an assignor actually accrued the obligation under Part 250. But they do not create accrual for infrastructure a predecessor neither installed nor owned as existing infrastructure under section 250.1702. If no accrual occurred under section 250.1702, there is nothing for sections 556.805 or 556.806 to preserve.

74.    Deference to an agency's interpretation of its regulations is "undoubtedly inappropriate, for example, when the agency's interpretation is plainly erroneous or inconsistent with the regulation." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (quotation omitted).

75.    For these reasons, the Decision, the underlying Decommissioning Order and Amended Order, and INC A805 predicated on the Decommissioning Order and Amended Order are arbitrary, capricious, and otherwise contrary to law, and should be vacated.

## <u>COUNT FIVE</u>
**The Department's Interpretation of Its Regulations Is Unreasonable as Contrary to the Regulations' Purpose**

76.    W&T repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

77.    An agency's regulatory interpretation is arbitrary and capricious if the interpretation of the regulation is unreasonable or inconsistent with the regulation's purpose. *Sw.*

16

*Pharmacy Sols., Inc. v. Centers for Medicare & Medicaid Servs.*, 718 F.3d 436, 443 (5th Cir. 2013).

78.    The BOEM operating rights transfer approval process was designed to close a narrow loophole that could otherwise enable sham transfers of operating rights in offshore leases. Before section 556.806 was published, an assignment could be deemed effective before BOEM approval, enabling lessees to escape liability through sham transactions. *See* 81 FED. REG. 18112, 18135 (March 20, 2016) (explaining that before the rule, if a request was made to assign a lease in April, it could become effective on the first of May, even if BOEM did not approve it until the fifteenth of May.). This context illustrates that the provision was intended to prevent abuse at the margins, not to extend predecessor liability for years as BSEE attempts to do here.

79.    W&T's divestiture in 2013 was a bona fide transfer of operating rights. EPL operated the lease for seven years, which is irreconcilable with any suggestion of a sham assignment. Moreover, BOEM itself approved requests that EPL submitted in December 2013 and in 2014 (after the assignment from W&T to EPL) to build pipelines, a platform, and wells. BOEM eventually approved the January 1, 2013 transfer—albeit after an unreasonable and unexplained four-year delay and after having approved EPL's post-assignment requests to build new infrastructure on WD 29. To apply section 556.805 in this case to saddle W&T with decommissioning liability for facilities installed long after its exit distorts the regulation beyond its intended scope.

80.    For these reasons, the Decision, the underlying Decommissioning Order and Amended Order, and INC A805 predicated on the Decommissioning Order and Amended Order are arbitrary, capricious, and otherwise contrary to law and should be vacated.

17

## COUNT SIX
**The Department's Determination of W&T's Decommissioning Obligations Is Based on Factual Errors**

81.     W&T repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

82.     An agency's decision is invalid if "it rests upon a factual premise that is unsupported by substantial evidence." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 346 (D.C. Cir. 2018). Reviewing courts cannot "defer to the agency's conclusory or unsupported suppositions." *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010) (quotation omitted).

83.     In her December 12, 2025, declaration, BOEM's Bernadette Thomas asserts that none of the eight unencumbered Assignments could be approved because of "numerous overlapping operating rights tracts on the Lease." If overlapping title issues affected all eleven Assignments, stipulations of interest would exist for all eleven. They do not. Only three Assignments required stipulations, confirming those issues were limited in scope and unrelated to the other eight. The three Stipulations bear no relationship to the remaining Assignments, including those covering the tracts where the EPL Infrastructure was installed.

84.     Despite this, BSEE alludes to an agreement or understanding among W&T, EPL, and BOEM attributing the stipulated title issues to W&T or conditioning approval of the eight unencumbered Assignments on resolution of the Stipulations, using the Thomas declaration as support. The record contains no such agreement.

85.     Moreover, the suggestion that W&T caused clouded title on those tracts defies logic. BOEM bears responsibility for reviewing and approving assignments of operating rights. Where overlapping interests exist because of predecessor assignments, BOEM must identify and resolve those issues contemporaneously during its review, not retroactively attribute them to an assignor after approval has issued.

18

86.     The approval timeline confirms that BOEM itself treated the eight unencumbered Assignments as independent from the stipulated interests. BOEM approved the eight unencumbered Assignments on March 21 and 24, 2017. BOEM approved the remaining three Assignments approximately six weeks later. Had BOEM conditioned approval of the eight unencumbered Assignments on resolution of the three Stipulations, the unencumbered Assignment approvals would not have issued first. BSEE's suggestion that BOEM "held back" approvals is contradicted by BOEM's actual conduct.

87.     For these reasons, the Decision, the underlying Decommissioning Order and Amended Order, and INC A805 predicated on the Decommissioning Order and Amended Order are arbitrary, capricious, and otherwise contrary to law and should be vacated.

<u>**COUNT SEVEN**</u>
**The Department's Determination of W&T's Decommissioning Obligations Failed to Consider Important Aspects of the Problem**

88.     W&T repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

89.     An agency's decision is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem." *Motor Vehicle Manufacturers' Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983).

90.     Punishing W&T for BOEM's administrative delay is arbitrary and capricious within the meaning of the APA, 5 U.S.C. § 706(2)(A), because the agency failed to consider an important aspect of the problem. The agency imposed decommissioning obligations on W&T based solely on BOEM's delayed approval date, ignoring clear evidence that BOEM unreasonably delayed its decision for more than four years. That failure led BSEE to treat W&T as if it remained

an operating rights owner years after it divested its interest, thereby extending liability to facilities that did not exist at the time of W&T's ownership.

91.     The absence of any stipulations-based rationale in the Administrative Record confirms that BSEE failed to consider whether the four-year delay was reasonable when determining W&T's accrued decommissioning obligations. Had BSEE actually grappled with BOEM's delay as part of its decision-making process, the Administrative Record would reflect that analysis and the materials on which it relied. Instead, the Administrative Record is devoid of any discussion of BOEM's delay or its relevance to W&T's accrued liabilities.

92.     BOEM's delay in approving the transaction was unprecedented and a consequence of BOEM's delay in correcting its own error. Nothing in the regulations or past practice with BOEM suggested to W&T that BOEM might withhold or defer approval for multiple years. Such rote reliance on a technicality, without accounting for the consequences of agency delay, exemplifies the kind of irrational decision making the APA forbids.

93.     For these reasons, the Decision, the underlying Decommissioning Order and Amended Order, and INC A805 predicated on the Decommissioning Order and Amended Order are arbitrary, capricious, and otherwise contrary to law, and should be vacated.

**<u>COUNT EIGHT</u>**
**The Department's Determination of W&T's Decommissioning Obligations Is Impermissibly Premised on Post Hoc Rationalization**

94.     W&T repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

95.     An agency's explanation for its decisions must reflect the contemporaneous grounds for the decision and not a post-hoc rationalization. *See SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943) ("We merely hold that an administrative order cannot be upheld unless the grounds

upon which the agency acted in exercising its powers were those upon which its action can be sustained"). "The fact that an agency provided a post hoc rationalization is relevant evidence that the action is arbitrary and capricious." *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 856 (5th Cir. 2022).

96.     Faced with EPL's default, BSEE applied the regulations in an illogical manner to shift liability back onto W&T. This improvisation distorts the regulatory framework, producing an absurd result in which an operator that divested operational interests in 2013 is retroactively assigned obligations for infrastructure installed years later based on nothing more than administrative delay. An administrative delay is not a rational basis for retroactively expanding liability.

97.     The contemporaneous communications between W&T, EPL, and BOEM do not support the claim that the parties knowingly agreed to allow BOEM to hold the operating rights assignments for almost four years, during which time EPL installed the EPL Infrastructure, with the understanding that they would be held liable for any accrued decommissioning obligation up until the date of the approval of the Assignments, not the effective date, in exchange for the dismissal of service fees.

98.     W&T, Chevron, and even BSEE believed the EPL Infrastructure to be orphaned assets. It was not until BSEE's May 12, 2025, email that BSEE cited 30 C.F.R. §§ 556.805–806 and BOEM's delayed approval of the Assignments as justification for BSEE's allocation to W&T of decommissioning obligations for the EPL Infrastructure.

99.     On appeal to IBLA, BSEE relied on a declaration from BOEM's former Chief of the Adjudication Section, Bernadette Thomas, to suggest BOEM properly withheld approval of the Assignments in 2013. But Ms. Thomas did not execute this declaration until December 2025—

21

a year and a half after BSEE issued the Decommissioning Order—and there is no evidence in the Administrative Record that BSEE discussed with BOEM or otherwise considered the cause for BOEM's unreasonable delay in approving the Assignments until *after* BSEE made its determination of W&T's liabilities. Post hoc explanations offered through an administrative proceeding cannot substitute for the agency's actual reasoning at the time of the decision.

100.    Additionally, the Stipulations themselves are not in the Administrative Record filed by BSEE. According to 43 C.F.R. § 4.406, BSEE has the burden to produce the Record on Appeal and "[a]ll documents and materials that the deciding officer directly or indirectly considered in reaching a final decision must be included in the record." Because the Stipulations were not included in the Administrative Record, BSEE never considered them in its decision-making process.

101.    For these reasons, the Decision, the underlying Decommissioning Order and Amended Order, and INC A805 predicated on the Decommissioning Order and Amended Order, are arbitrary, capricious, and otherwise contrary to law, and should be vacated.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, W&T prays that this Court:

(a) Vacate IBLA's Decision and declare that IBLA has jurisdiction to consider W&T's INC Appeal;

(b) Declare that the Decommissioning Order and Amended Order are not administratively final;

(c) Vacate the Decommissioning Order, Amended Order, and INC A805 and declare that W&T is not responsible for decommissioning the EPL Infrastructure, or, in the alternative, remand the dispute to the Department for further proceedings to consider whether W&T may be held responsible for decommissioning the EPL Infrastructure;

(d) Grant W&T such other relief as the Court deems appropriate under the circumstances.

Dated: April 29, 2026

Respectfully Submitted,

By: */s/ Marc S. Tabolsky*
***Attorney in Charge***
Marc S. Tabolsky
Texas Bar No. 24037576
S.D. Tex. No. 37164
Liz A. Pursley
Texas Bar No. 24116927
S.D. Tex. No. 3881860
Rebecca Scribner
Texas Bar No. 24145988
S.D. Tex. No. 3913572
HICKS JOHNSON PLLC
1550 Lamar Street, Suite 1900
Houston, Texas 77010
Phone: 713-357-5150
Fax: 713-357-5160
mtabolsky@hicksjohnson.com
epursley@hicksjohnson.com
bscribner@hicksjohnson.com

**ATTORNEYS FOR PLAINTIFF
 W&T OFFSHORE, INC.**